IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  v.<br><br>ALEXANDER BASSIGNANI,<br><br>        Defendant.<br>_____/ | No. CR 06-0657 SI<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS** |

On August 17, 2007, the Court held a hearing on defendant's motion to suppress. After consideration of the parties' submissions and the arguments of counsel, the Court GRANTS in part and DENIES in part defendant's motion.

**BACKGROUND**

On September 28, 2006, a grand jury indicted defendant Alexander Bassignani on one count of distributing child pornography and one count of possession of child pornography. Law enforcement officers began investigating defendant in 2005 after Yahoo, Inc. made three reports to the National Center for Missing and Exploited Children that a user with the email address big_perm2469@yahoo.com had uploaded child pornographic images to Yahoo sites. *See* Williams Decl. Ex. A at 5 (Sacramento County Sheriff's Department Crime Report). According to a report prepared by Detective James Williams of the Sacramento Valley Hi Tech Crimes Task Force, investigators learned from Yahoo that the alternate email address for the user of big_perm2469@yahoo.com was Alex.bassignani@tellabs.com. *Id.* at 6. Detective Williams checked the Internet Protocol ("IP") addresses listed in the connection logs provided by Yahoo for the email

address of big_perm2469@yahoo.com, and found that the majority were from the same address, which belonged to Tellabs.com, a business located at 1465 North McDowell Blvd., Petaluma, California 94954. *Id*. at 7.

Williams contacted Tellabs and spoke with Mr. Kyle Matthews, Vice President Human Resources and Assistant General Counsel. *Id*. Williams explained that he was investigating distribution of child pornography and that he suspected images were being sent from a computer within the Tellabs Petaluma office. *Id*. Matthews confirmed that Tellabs had an employee named Alexander Bassignani; that Bassignani had access to a desktop computer with Internet access; and that Tellabs had already discovered that Bassignani had installed on work computer (in violation of Tellabs policy) software called "Window Washer," which can be set to delete and overwrite Internet-browsing history and other information on a computer hard drive. *Id*.

Officers also learned that the email account big_perm2469@yahoo.com had previously been accessed through an IP address assigned to Alex Bassignani at his home in Santa Rosa. *Id*. Officers also searched Department of Motor Vehicles records and discovered that Bassignani had a 2001 Hyundai registered to him and a Rosemary R. Bassignani, at Bassignani's residence.

On February 21, 2006, Sonoma County Superior Court Judge Antolini issued a search warrant for (1) "[t]he workspace belonging to/under the control of Alexander Bassignani, located within a Business known as Tellabs located at, 1465 North McDowell Blvd., Petaluma, California," (2) Bassignani's residence, (3) "the vehicle described as a 2001 Hyundai Elantra Gis/Gt bearing California license # 4 UQK735 including containers of any kind within the vehicle, (4) "[a]ny vehicle in the immediate vicinity of 1465 North McDowell Blvd, Petaluma, California, that is in the custody or control of Alexander Bassignani . . . .", (5) "[a]ny vehicle in the immediate vicinity of [Bassignani's residence], that is in the custody or control of Alexander Bassignani, and (6) Bassignani's person. *Id*. Ex. B at 2 (search warrant). The warrant authorized officers to search for, *inter alia*, computer software and images of child pornography. *Id*. at 2-3.

On February 23, 2006, Detective Williams and three other detectives served the search warrant at Tellabs. Williams, defendant, and Tellabs Human Resources Manager Sasha King have all submitted declarations setting forth their accounts of what occurred that day. According to Williams, when he and

the other officers arrived at the location listed on the search warrant, 1465 North McDowell Boulevard, Petaluma, they were informed that they were at the wrong address, and that defendant was located at 2200 South McDowell Boulevard, Petaluma. Williams Decl. ¶ 5.

Officers arrived at the South McDowell Boulevard site, and met Sasha King. Ms. King and the officers approached defendant's work space. Ms. King describes the encounter as follows:

> As we continued to Bassignani's work station, Bassignani was on the computer with his back to us. Detective James approached Bassignani and asked him to remove himself from the computer. Bassignani was hesitant, so Detective Williams reiterated the request a few more times before Bassignani complied. Bassignani was then instructed to follow me as Detective Williams remained at Bassignani's side. I led them back to the conference room.

King Decl. ¶ 5. Once in the conference room, Detective Williams introduced himself ("I work Internet crimes against children") and two other officers, and provided defendant with a copy of his business card and of the search warrant. Williams told defendant "I've got some questions for you" and he informed defendant that officers had a search warrant for him, his car, and his residence. Williams told defendant that to "make things easier for everybody" with regard to executing the search warrant at defendant's house, he wanted defendant to answer some questions about his house, such as whether defendant's wife was home, whether defendant had any dogs or guns, and where defendant's house keys were. Defendant was initially uncooperative, and repeatedly asked "Can I not read this [the search warrant] or what?"

Approximately two minutes into the interrogation,[1] Williams told defendant "You're not under arrest. You're not being arrested. You'll walk out of here when we're done." Williams and defendant then engaged in following colloquy:

Defendant: "What are you after?"

Williams: "I'll be more than happy to explain that to you once I get my partners out there to finish their job at your house . . . ." [Williams asked defendant for his car keys.]

Defendant: "I understand you're trying to do your job, but you want information and you're not letting me understand what you're trying to do."

Williams: "Read the warrant, read the warrant. [Talks to other person] Go ahead and read

---

[1] The government has provided a compact disk of the taped interrogation. The Court has listened to the entire taped interrogation.

3

| | | |
|---|---|---|
| 1 | | the warrant and then I'll be more than happy to talk to you." |
| 2 | Defendant: | "Well see, now you're being, why do you got to be like that? I'm just asking you simple questions." |
| 3 | | |
| 4 | Williams: | "I'm not going to sit here and talk about everything in front of another person who works here." |
| 5 | Defendant: | "Why didn't you just tell me that?" |
| 6 | Williams: | "Because I'm trying to be as easy for you as I can, we're doing a child pornography investigation, I work internet crimes against children. Your email address has accessed and uploaded images of child pornography. That's why we're here." |
| 7 | | |
| 8 | | |
| 9 | Defendant: | "Really?" |
| 10 | Williams: | "Yes, so if you'd like me to tell all of that in front of the Human Resources lady or whatever her position is here, I'll be more than happy to. I'm trying to do this as easy for you as I can. But if you want to come up with a bad ass attitude in the beginning." |
| 11 | | |
| 12 | Defendant: | "I don't have an attitude, I'm just asking, you're not telling me what you're after." [Further discussion of what officers will search for at defendant's house]. |
| 13 | | |

Williams also told defendant that if he did not provide his car keys, officers would be forced to break the window of the vehicle. Williams then asked defendant what vehicle he had in the Tellabs parking lot, and defendant stated that it was a blue Nissan pickup truck. Williams reiterated that officers had a search warrant for defendant's car, and that if defendant did not provide the keys, officers would break the window on defendant's truck. Defendant then authorized Ms. King to retrieve the keys from defendant's lunch pail, which was located at defendant's work space.

Williams proceeded to interrogate defendant for a total of approximately two and a half hours. Williams questioned defendant about, *inter alia*, defendant's use of the big_perm2469@yahoo.com account, specific pornographic images that defendant posted to Yahoo sites, and defendant's possession of child pornography on various computers. Approximately an hour into the interrogation, during a line of questions regarding whether defendant remembered possessing or trading specific images of child pornography, defendant stated, "I don't want you to get mad again, because you make that face . . . . I understand that you're doing your job, but I just needed at the beginning to slow you down for just a second, you know, I don't want you to get mad, to start threatening and this and that, I want to steer clear of that." Williams responded that he was not threatening defendant, had not threatened defendant,

and was not mad at defendant.

Approximately two hours into the interrogation, defendant asked Williams "at what point in this game do I need to get a lawyer?" Williams responded, "Me? I'd wait until you get arrested, but that's me. Like I said at the beginning, you're not under arrest, you're going to walk out of here." Williams also told defendant that he was "more than welcome to walk right out and call [a lawyer]." Defendant responded, "I don't know if there's an interrogator here and the witness," to which Williams responded, "No, no," and said, "I don't like the word interrogator, it's interview. Interrogation has such a bad sound."

Near the end of the interrogation, Williams asked defendant if he had any questions. Defendant proceeded to ask a series of questions about what would happen next, and what information officers had provided to Tellabs about the investigation. Officers informed defendant that they had found the Window Washer program and a Window Washer case in defendant's lunch pail and truck.

## DISCUSSION

Defendant moves to suppress the statements he made during the interrogation, the Window Washer program found in defendant's lunch pail, any evidence found in defendant's truck, and any evidence found on the Tellabs computers. Defendant contends that he was "in custody" for *Miranda* purposes during the interrogation, and that the officer's failure to administer the familiar *Miranda* warnings requires suppression of his statements. Defendant argues that he did not validly consent to the search of his lunch pail or his truck because he was misled into believing that the search warrant authorized the search of the Nissan truck. Finally, defendant appears to argue that Tellabs' consent to seize the Tellabs computers was somehow invalid.

### I.    Custody

"An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is 'in custody.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (*quoting Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). To determine whether an individual was in custody, the Court must consider all of the circumstances surrounding the

1 interrogation and decide "whether there [was] a formal arrest or restraint on freedom of movement of
2 the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal
3 quotation marks omitted). The inquiry "depends on the objective circumstances of the interrogation,
4 not on the subjective views harbored by either the interrogating officers or the person being questioned."
5 *Id.* at 323. The Court must decide whether "the officers established a setting from which a reasonable
6 person would believe that he or she was not free to leave." *United States v. Beraun-Panez*, 812 F.2d
7 578, 580 (9th Cir.), *modified by* 830 F.2d 129 (9th Cir. 1987). The Ninth Circuit has identified the
8 following factors as "among those likely to be relevant to deciding [the custodial] question: '(1) the
9 language used to summon the individual; (2) the extent to which the defendant is confronted with
10 evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention;
11 and (5) the degree of pressure applied to detain the individual.'" *Kim*, 292 F.3d at 974 (*quoting United
12 States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)). These factors are not exhaustive. *Kim*, 292
13 F.3d at 974.

14 The Court has reviewed the declarations of Detective Williams, Ms. King, and defendant, and
15 has also listened to the entire two and a half hour interrogation of defendant. Under the totality of the
16 circumstances surrounding the interrogation, the Court concludes that defendant was in custody for
17 *Miranda* purposes. As to the first factor, the police summoned defendant; he did not voluntarily
18 approach or accompany law enforcement officers. Ms. King's declaration states that Detective
19 Williams, another officer, and Ms. King approached defendant's work space, and that "Bassignani was
20 then instructed to follow me as Detective Williams remained at Bassignani's side. I led them back to
21 the conference room." King Decl. ¶ 5. Courts have held that defendants are not in custody when the
22 defendant voluntarily accompanies the police to the police station with the understanding that
23 questioning would ensue. *See, e.g.*, *Mathiason*, 429 U.S. at 495 (defendant not in custody when he came
24 to police station voluntarily and left "without hindrance" after 30 minutes of questioning). Here,
25 however, police officers instructed defendant to leave his work space, and brought defendant to an
26 enclosed conference room for questioning.

27 The second factor – the extent to which the defendant is confronted with evidence of guilt –
28 further weighs in favor of finding that defendant was in custody. Detective Williams repeatedly

6

1 interrogated defendant about his use of the big_perm2469@yahoo.com account and specific images of
2 child pornography associated with that account.[2] Williams questioned defendant about, *inter alia*, the
3 sources of the pornographic images, whether and how defendant exchanged those images with other
4 people, and where defendant stored the images. After officers executed the search warrant at
5 defendant's house, Detective Williams interrogated defendant about evidence found at the residence,
6 such as defendant's laptop computer. Towards the end of the interrogation, Williams informed
7 defendant that "the big thing is, it's your laptop . . . I'm not going to lie to you . . . we've got your email
8 connected to the images, it's a done thing." Such extensive questioning about evidence of defendant's
9 guilt supports a finding of custody. *See, e.g.*, *Beraun-Panez*, 812 F.2d at 579, 580; *United States v.*
10 *Wauneka*, 770 F.2d 1434, 1438-39 (9th Cir. 1985); *United States v. Booth*, 669 F.2d 1231, 1237 (9th
11 Cir. 1981).

12 The third factor examines the physical surroundings of the interrogation. The Court finds that
13 this factor is neutral in the custodial analysis. The government emphasizes the fact that defendant was
14 questioned in the familiar surroundings of his workplace rather than the more coercive environment of
15 a police station. While a workplace is certainly a more comfortable and familiar environment than a
16 police station, the surroundings were nevertheless somewhat coercive as defendant was brought to an
17 enclosed conference room by a Human Resources manager and two to three police officers for lengthy
18 questioning.

19 The next factor – the duration of the interrogation – strongly suggests that defendant was in
20 custody. The taped interrogation lasted approximately two and a half hours. The Ninth Circuit has
21 previously found that a 90 minute detention is "on the high end of our precedent." *Kim*, 292 F.3d at 981
22 (O'Scannlain, J., dissenting from decision holding the defendant was in custody, but acknowledging that
23 90 minute detention "admittedly seems on the high end of precedent.").

24 Finally, the Court considers the degree of pressure applied to detain the individual. Here,
25 although officers told defendant that he was not under arrest, officers did not tell defendant he was free
26 to leave, and in fact implied the opposite when Detective Williams told defendant, "you'll walk out of

---

28 [2] From the audio tape, it also appears that officers may have shown actual images to defendant during the questioning. The declarations submitted by the parties do not address this issue.

7

here when we're done." There is a factual dispute as to whether officers patted defendant down at the beginning of the interrogation, and also whether officers locked – or appeared to lock – the door of the conference room. However, even if officers did not pat defendant down or appear to lock the conference room, the Court finds that the totality of the circumstances – in particular the length of the interrogation, Williams' statement to defendant that "You'll walk out of here when we're done," and the fact that officers repeatedly confronted defendant with evidence of his guilt – all indicate that defendant was "in custody" for purposes of *Miranda*.

Accordingly, the Court GRANTS defendant's motion to suppress the statements defendant made during the custodial interrogation.

## II.   Consent search

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. When a search or seizure is conducted without a warrant, the government must establish, by a preponderance of the evidence, that it did not violate the Fourth Amendment. *See United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir. 1994). Evidence resulting from an unconstitutional search or seizure cannot be admitted as proof against the victim of the search, and therefore must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

"[A] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Whether consent to search was voluntarily given is "to be determined from the totality of all the circumstances." *Id*. It is the government's burden to prove that the consent was freely and voluntarily given. *See Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997). The Ninth Circuit has identified five factors to be considered in determining the voluntariness of consent to a search. They are: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002). No one factor is determinative in the equation. *See United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988); *see also United States v. Morning*, 64

1 F.3d 531, 533 (9th Cir. 1995) ("[A]lthough we have established these factors to aid in the decision
2 making process, the full richness of every encounter must be considered . . . Every encounter has its own
3 facts and its own dynamics. So does every consent").

### A. Seizure of Tellabs computers/hard drives

In proving voluntary consent, the government "is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see also United States v. Davis*, 332 F.3d 1163, 1168-69 (9th Cir. 2003). The Ninth Circuit has held that an employer can validly consent to a search of an employee's workplace computer because "the computer is the type of workplace property that remains within the control of the employer 'even if the employee has placed personal items in [it].'" *United States v. Ziegler*, 474 F.3d 1184, 1191 (9th Cir. 2007) (*quoting O'Connor v. Ortega*, 480 U.S. 709, 716 (1987)).

Here, defendant's employer consented to the seizure of the Tellabs computers and hard drives. Tellabs Human Resources Manager Sasha King gave consent in writing. *See* Williams Decl. Ex. C. Ms. King states in her declaration that she provided that consent "voluntarily" on behalf of Tellabs, and that she "was not pressured or coerced in any way to give that consent." King Decl. ¶ 12. Further, officers took the extra precaution of obtaining an additional warrant to search the contents of the Tellabs computers after Tellabs consented to their seizure. The Court finds that Tellabs validly consented to the seizure of the Tellabs computers. *See Ziegler*, 474 F.3d at 1191-92.

### B. Search of defendant's lunch pail and Nissan truck

The government contends that defendant validly consented to the search of his lunch pail and truck when he told officers "You're more than welcome to take the keys out of my lunch pail and go open my truck." The government acknowledges that the search warrant did not authorize the search of defendant's truck, but that the totality of the circumstances show that defendant voluntarily consented to the search.

9

1    The Court disagrees, and finds that the government has not met its burden to show defendant
2 validly consented to the search of his lunch pail or his truck. The recorded interrogation plainly shows
3 that officers misled defendant into thinking that the search warrant authorized the search of defendant's
4 truck. Defendant was initially resistant to providing the truck keys – and consenting to the search – until
5 Detective Williams repeatedly informed defendant that the warrant covered defendant's "car," and that
6 if defendant did not provide the keys, officers would be forced to break the truck windows. Under those
7 circumstances, combined with all of the facts discussed in Section I above regarding the custodial nature
8 of the interrogation, the Court finds that defendant did not validly consent to the search of the lunch pail
9 or the truck. *See Chan-Jimenez*, 125 F.3d at 1327-28 (holding defendant did not validly consent to
10 search of truck when, *inter alia*, defendant was "seized" under Fourth Amendment, was not *Mirandized*,
11 and failed to respond verbally to officers' requests).

12    The government also contends that even if defendant did not validly consent, the search of
13 defendant's truck is justified under the "vehicle search exception." The Supreme Court has held that
14 police may conduct a warrantless search of a vehicle if they have probable cause to believe that it
15 contains contraband. *See Carroll v. United States*, 267 U.S. 132, 162 (1925); *see also United States v.*
16 *Ross*, 456 U.S. 798, 799 (1982). "This rule is known as the 'automobile exception' to the general rule
17 that the police must obtain a warrant before executing a search." *United States v. Pinela-Hernandez*,
18 262 F.3d 974, 977-78 (9th Cir. 2001) (*quoting California v. Carney*, 471 U.S. 386, 390 (1985)).

19    Defendant's papers do not address this contention. At the hearing, defendant appeared to
20 acknowledge that under Supreme Court and Ninth Circuit case law, officers could search defendant's
21 truck without a warrant provided they had probable cause. Defendant does not challenge probable
22 cause. Instead, defendant argued that none of the rationales supporting the "automobile exception" apply
23 in this case. While the Court recognizes that the original reasons for this exception have little
24 applicability here, the Court is nevertheless bound by the above-cited case law. Accordingly, the Court
25 holds that because officers had probable cause to believe that defendant's truck contained evidence
26 related to child pornography, the warrantless search of defendant's truck was permissible.

27
28                                                 **CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS in part and DENIES in part defendant's motion to suppress. (Docket No. 12). The Court suppresses the statements defendant made during the interrogation, and suppresses the evidence found in defendant's lunch pail. The Court does not suppress any evidence found on the Tellabs computers or hard drives, or in defendant's truck.

**IT IS SO ORDERED.**

Dated: August 20, 2007

SUSAN ILLSTON
United States District Judge